UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

GARNEL CELESTIN,

                          Plaintiff,

          - against -                                    MEMORANDUM AND ORDER

CITY OF NEW YORK, POLICE OFFICER              04-CV-3009 (ILG)
RAMON PADILLA, DETECTIVE CHARLES
ROBINSON, DETECTIVE PATRICK BOYLE,
WILLIAM ALLEE, and POLICE OFFICER
JOHN DOES 1-5
                          Defendants.
-------------------------------------------------------x

GLASSER, United States Senior District Judge:

          Shortly after midnight on October 6, 2002, Plaintiff Garnel Celestin ("Celestin")

was at the front entrance of a party at 505 Ocean Avenue, Brooklyn, New York.  At

approximately 12:29 a.m., a 911 dispatcher received a call of "shots fired" coming from

the basement of the building.  See Defendants' Local Rule 56.1 Statement of Undisputed

Facts ("Def. 56.1 Statement"), dated June 30, 2006, ¶ 2; Plaintiff's Local Rule 56.1

Statement ("Pl. 56.1 Statement"), dated November 2, 2006, ¶ 2; Declaration of Liora

Jacobi ("Jacobi Decl."), dated June 30, 2006, Ex. B at 1.  Celestin claims he suffered a

gunshot wound to the shoulder as a result of the reported shooting.  See Def. 56.1

Statement ¶ 162.  New York City Police Officers Ramon Padilla and Claude Jean-Pierre

responded to 505 Ocean Avenue to investigate the 911 call.  See Def. 56.1 Statement ¶ 6.

While on scene, Officer Jean-Pierre claims that he and a young black male engaged in a

fight and that the male shot him in the wrist after gaining control of his service weapon.

See Jacobi Decl., Ex. D at 73:17-75:18.  Officer Padilla believed that he shot the young

black male in the shoulder before he escaped.  See id., Ex. C at 44:15-22.  Later that

night, police investigators determined that Celestin was the individual who had shot Officer Jean-Pierre. Celestin was arrested and indicted two weeks later. All criminal charges against Celestin were dismissed in September of 2003 after DNA test results showed that Celestin's DNA did not match any DNA evidence found at the scene. See id., Ex. Q at 84:19-85:5; see Def. 56.1 Statement ¶ 157.

Celestin alleges that he was prosecuted to cover up an accidental shooting of Officer Jean-Pierre that he had nothing to do with. On July 12, 2004, Celestin filed an action against the City of New York (the "City"), Detective Charles Robinson, Detective Patrick Boyle, Officer Ramon Padilla, Chief of Detectives William Allee, and John Does 1-5 (collectively, the "defendants") pursuant to 42 U.S.C. § 1983 for false arrest, malicious prosecution, conspiracy, and the municipality's failure to train and supervise, as well as state tort claims for the same. On June 30, 2006, the defendants filed a motion for summary judgment on all claims pursuant to Fed. R. Civ. P. 56(c) on the grounds that probable cause existed to arrest and prosecute the plaintiff, the defendants are entitled to qualified immunity, and the plaintiff fails to state a claim for conspiracy and municipal liability.

## FACTS

The following facts are undisputed unless otherwise noted.

### A.      Shooting of Officer Jean-Pierre

When Officers Ramon Padilla and Claude Jean-Pierre responded to the 911 call of "shots fired" at 505 Ocean Avenue, they discovered a party in progress in the basement. See Def. 56.1 Statement ¶¶ 6, 13. The officers proceeded into the basement where Officer Padilla stopped to talk with a disc jockey in a large party room. Officer Jean-

Pierre walked alone down a hallway and entered a small room with a low-lying window through which party-goers were exiting the building.  See id. ¶¶ 14-15

What precisely happened in that small room is disputed.  While the plaintiff does not dispute that Officer Jean-Pierre was shot in the wrist, he asserts that the officers' version of events was fabricated to cover up an accidental shooting of Officer Jean-Pierre by a police weapon.  See Pl. 56.1 Statement ¶ 17.  The defendants, however, contend that Officer Jean-Pierre drew his weapon and attempted to prevent a black male (the "suspect") from exiting through the window after observing him pass a silver firearm to another person standing outside.  See Def. 56.1 Statement ¶¶ 18,19, 26.  They struggled, and the suspect knocked Officer Jean-Pierre's gun out of his hand and gained possession of it.  See id. ¶¶ 32-33.  Hearing Officer Jean-Pierre yell, Officer Padilla ran into the room and observed the suspect pointing a gun at his partner.  See id. ¶¶ 34-35, 40; Jacobi Decl., Ex. C at 32:20-22.  Officer Padilla heard the suspect say, "I'm going to kill you . . . ," and then saw him shoot Officer Jean-Pierre.  See Def. 56.1 Statement ¶¶ 41-42.  Officer Padilla then drew his police-issued 9 millimeter pistol and shouted, "Police, don't move," and fired two hollow point bullets at the suspect as he fled out the window.  See id. ¶¶ 43, 46, 48-49, 51; Allen Decl., Ex. 11 at 46:20-47:3.  Officer Padilla told Officer Jean-Pierre that he thought he had hit the suspect in the shoulder.  See Def. 56.1 Statement ¶ 50; see Jacobi Decl., Ex. C at 53:15-17, Ex. D at 81:13-14.

The plaintiff and the defendants do not dispute that Officer Padilla transmitted over his police radio that Officer Jean-Pierre had been shot by a black male between 16 and 18 years old, standing about 5'7" tall, weighing between 135 and 145 pounds, and wearing a white New Jersey Nets basketball jersey and a dark undershirt.  See Def. 56.1

Statement ¶¶ 54, 56-57.  The fact that the suspect may have been shot was also transmitted.  <u>See</u> <u>id.</u> ¶ 61.

### B.    Celestin becomes a suspect in the shooting

The police immediately began to search for the gunman throughout Brooklyn. <u>See</u> <u>id.</u> ¶ 60.  Because he may have been shot, the search included area hospitals.  <u>See</u> <u>id.</u> ¶ 62.  Detective Patrick Boyle, a defendant in this matter, responded to Caledonia Hospital, the hospital nearest to the scene, and found Celestin sitting on a gurney in the emergency room with a bandage on his shoulder.  <u>See</u> <u>id.</u> ¶¶ 64, 67, 69; Jacobi Decl., Ex. E at 39:6-9, 46:5-8.  Det. Boyle introduced himself but did not offer any <u>Miranda</u> warnings because, according to Det. Boyle, Celestin was not in custody.  <u>See</u> Def. 56.1 Statement ¶ 72; <u>see</u> Jacobi Decl., Ex. E at 55:2-15.

Celestin told Det. Boyle that he had been in front of 505 Ocean Avenue around 12:30 a.m. when a fight broke out, and upon attempting to break up the fight, he was shot.  <u>See</u> Def. 56.1 Statement ¶ 73; <u>see</u> Pl. 56.1 Statement ¶ 73; <u>see</u> Jacobi Decl., Ex. F at 1.  He then proceeded on foot to Caledonia Hospital, arriving at approximately 12:45 a.m.  <u>See</u> Jacobi Decl., Ex. E at 55:18-25, Ex. F at 1; <u>see</u> Def. 56.1 Statement ¶ 70.  Det. Boyle testified that Celestin did not appear nervous when speaking with him.  <u>See</u> Allen Decl., Ex. 6 at 61:15-17.

At the time, Celestin was 36 years old, 5'8" tall, and 155 pounds.  <u>See</u> Jacobi Decl., Ex. K.  Det. Boyle recorded that Celestin was wearing black jeans and a gray long sleeve tee shirt with a bullet hole in the front right collarbone area with a bloodstain around it. <u>See</u> <u>id.</u>, Ex. F at 2.  A Crime Scene Unit examined and bagged Celestin's clothing, and Det. Boyle eventually had Celestin's clothing  vouchered.  <u>See</u> Def. 56.1 Statement  ¶ 84,

89.  Because it was a "strange coincidence" that a police officer claimed to have shot the suspect at the same location around the same time as Celestin was shot, Det. Boyle thought Celestin's story was "very suspect" but did not place him under arrest.  See Jacobi Decl., Ex. E at 60:15-61:2; see Def. 56.1 Statement ¶ 75-76.  Det. Boyle provided his written reports to investigators who were continuing to work the case.  See Def. 56.1 Statement ¶ 107.

### C.    Involvement of Chief William Allee in the investigation

Within an hour of Det. Boyle's arrival at the hospital, Chief of Detectives William Allee, also a defendant in this matter, arrived at the emergency room.  Det. Boyle briefed Chief Allee on what he had learned from Celestin, and Chief Allee gave Det. Boyle a brief description of what transpired at 505 Ocean Avenue.  See Allen Decl., Ex. 6 at 70:23-71:6; See Jacobi Decl., Ex. E at 83:6-7, 97:10-11.  After the briefing, Chief Allee spoke with Celestin.  See Allen Decl., Ex. 6 at 88:13-19.  Det. Boyle recalls the conversation getting much louder and both men ultimately yelling at each other.  See id. at 91:6-25.

Celestin has testified that Chief Allee approached him and said "so you shot one of my officers."  See id., Ex. 1 at 283:14.  Celestin asked what he was talking about.  Chief Allee responded "oh, don't give me that . . . .  You know what I'm talking about" and "don't be a . . . slick.  You've been around.  You got a record," and the conversation became heated.  See id. at 283:17-18; see Jacobi Decl., Ex. R at 16:23-17:1.  Chief Allee testified that he approached Celestin to see how he was being treated and that he had no intention to further the investigation by determining whether or not Celestin was the shooter.  See Allen Decl., Ex. 8 at 64:14-23, 84:2-11.  Chief Allee has asserted that he raised his voice only after Celestin raised his.  See id. at 106:11-12.

Det. Boyle testified that after the argument Chief Allee told him that Celestin was under arrest.  See Def. 56.1 Statement ¶¶ 79-80; see Allen Decl., Ex. 6 at 91:6-10, 93:9-15; see Jacobi Decl. Ex. E at 92:2-25.  Celestin, however, was not handcuffed at that time nor was he, in fact, placed under arrest.  Chief Allee denied that he ordered Celestin's arrest and stated that he merely expressed to other officers that he "liked him as the bad guy, as the perp."  Allen Decl., Ex. 8 at 136:19-20, 136:25-138:24.  He testified that he did not expect this expression would have led anyone to either detain or arrest Celestin, and no officer did.  See id. at 138:15-24.

### D.      Officer Padilla's identification of Celestin at Caledonia Hospital

Officer Jean-Pierre was rushed to Kings County Hospital to receive treatment for his gunshot wound, and Officer Padilla was transported to Caledonia Hospital for treatment of a hand injury he sustained helping his wounded partner out of the basement.  See Jacobi Decl., Ex. C at 61:2-14; Def. 56.1 Statement ¶ 59.  In the emergency room, Officer Padilla saw Celestin sitting 15 to 20 feet away receiving treatment and speaking with police detectives.  See Def. 56.1 Statement ¶¶ 110-111, 113, 115.  He believed that "there was a possibility" that Celestin was the shooter because he recognized Celestin's voice and goatee.  See Jacobi Decl., Ex. C at 70:5-8; see Def. 56.1 Statement ¶¶ 116, 118-19; see Jacobi Decl., Ex. C at 143:4-10.  In his deposition, Officer Padilla initially testified that he informed a police officer at Caledonia Hospital that Celestin had shot his partner, but he did not remember who he informed.  See Jacobi Decl., Ex. C at 77:10-14.  Later in his deposition, however, Officer Padilla stated that he "could have maybe" told a police officer that Celestin was the shooter and that "I don't remember telling anybody anything."  See Allen Decl., Ex. 11 at 144:22-23.   None of the

police officers deposed in this case remember Officer Padilla identifying Celestin as the shooter while at Caledonia Hospital.

### E.     Detective Charles Robinson's investigation

Detective Charles Robinson, a defendant in this matter, responded to 505 Ocean Avenue and was assigned as the lead detective for the case.  Jacobi Decl., Ex. L at 24:16-19.  Det. Robinson surveyed the scene with Inspector Wheeler, a supervisor, who briefed him on the shooting and informed him that Garnel Celestin was a suspect.  See id. at 28:6-29:14; see Allen Decl., Ex. 10 at 38:3-21.  Det. Robinson neither visited Caledonia Hospital that morning nor inquired as to the nature of Celestin's gunshot wound.  See id. at 46:20-23, 50:22-24, 56:12-14.

Det. Robinson later assembled a photo array to show Officer Padilla for the purpose of determining whether he could identify the shooter.  Because Celestin was a suspect, Det. Robinson included a photo of Celestin from a police database in addition to five other photos of black males with similar distinguishing features.  See id., at 72:21-73:6; see Allen Decl., Ex. 10 at 171:19-23.  Prior to assembling the photo array, he read the description of the suspect that was broadcast earlier over the police radio but was unaware that the initial description came from Officer Padilla.  See Jacobi Decl., Ex. L at 67:13-20, 72:3-5.  Det. Robinson never asked Officer Padilla, Officer Jean-Pierre, or any other eyewitness to describe the suspect.  See Jacobi Decl., Ex. L at 72:13-20, 73:10-24.

At approximately 6:45 a.m. on October 6, 2002, Det. Robinson showed Officer Padilla a photo array numbered "63290" that included Celestin's photograph positioned first followed by five other photos.  See Def. 56.1 Statement ¶¶ 121, 132, 135; see Jacobi Decl., Ex. M.  Officer Padilla identified Celestin as the shooter and signed his name

under Celestin's photo.  See Def. 56.1 Statement ¶¶ 122, 136-137.  After the

identification, Det. Robinson learned that Officer Padilla was treated at Caledonia

Hospital earlier that morning and had seen Celestin there.[1]  See id. ¶ 138.

The plaintiff contends that photo array "63290" was possibly the second photo

array shown to Officer Padilla that morning.  See Pl. 56.1 Statement ¶ 271.  The record

before the Court includes a photo array numbered "63289" dated October 6, 2002 in

which Celestin's photo was also included.  See Allen Decl., Ex. 13.  Det. Robinson

testified that he had never seen photo array "63289" before but its serial number

indicated it was created before photo array "63290."  See id., Ex. 10 at 175:3-7.  Det.

Robinson did not know whether photo array "63289" was ever shown to any witness,

but he testified it was possible that it was shown to Officer Padilla before photo array

"63290".  See id. at 176:7-20.

Det. Robinson testified that Celestin was not under arrest at the time Officer

Padilla identified him in the photo array.  See id. at 120:18-23.  Det. Robinson formally

arrested Celestin at 12:30 p.m. that day at Brooklyn Hospital to which Celestin had been

transported earlier that morning to receive additional treatment.  See Def. 56.1

Statement ¶¶ 124, 126.  The grounds on which Det. Robinson based the arrest were the

photo array identification, information that placed Celestin at 505 Ocean Avenue at the

time of the shooting, and Celestin's gunshot wound that was consistent with Officer

Padilla's account of shooting the suspect.  See id. ¶¶ 134, 140.  Det. Robinson testified

that at the time of arrest he was unaware that Celestin claimed to have been shot prior to

---

[1]        Det. Robinson did not speak with Officer Padilla directly but rather through Officer
Padilla's union representative who was present during the photo array identification.  See Jacobi Decl., Ex.
L at 76:10-77:23.  Det. Robinson explained that policy concerning police shootings restricted him from
communicating directly with Officer Padilla.  See id.

the shooting of Officer Jean-Pierre.  See Allen Decl., Ex. 10 at 125:14-21, 129:3-131:5.

The plaintiff argues that the true reason for the arrest was the pressure Det. Robinson

was under from his superiors to make an arrest, pressure that Det. Robinson has

acknowledged he felt.   See Pl. 56.1 Statement ¶ 140; see Allen Decl., Ex. 10 at 196:14-

197:3.

### F.      Celestin's testimony before the Grand Jury

On October 16, 2002, ten days after his arrest, Celestin voluntarily testified

before the Grand Jury.  See Def. 56.1 Statement ¶ 161.  He testified that he was not

involved in the shooting, was not in possession of a handgun on the evening of the

shooting, and never saw any police officers while he was at 505 Ocean Avenue.  See id.

¶¶ 170-71, 174.  He testified that he was shot at the entrance to the party and

immediately ran to Caledonia Hospital.  See id. ¶¶ 162, 164.  Celestin also stated that he

was in the hospital for approximately 10 to 15 minutes before he saw any police arrive.

See id. ¶ 167.  He confirmed the verbal altercation with Chief Allee and stated that he

was unaware that any police officer had been shot until Chief Allee told him.  See id. ¶

168; see Jacobi Decl., Ex. R at 18:16-18.  Celestin also told the Grand Jury that while he

was at Caledonia he was never in handcuffs, and when he asked whether he was under

arrest, Det. Boyle informed him that he was not.  See Allen Decl., Ex. 1 at 279:1-281:24.

### G.      Participation of ADA Tom Ridges

At the time ADA Tom Ridges presented Celestin's case to the Grand Jury, he was

aware that Officer Padilla identified Celestin as the shooter.  See Jacobi Decl., Ex. Q at

42:12-19.  ADA Ridges also knew that Officer Padilla believed he had shot the suspect,

that Celestin entered Caledonia Hospital with a gunshot wound, and that Caledonia

Hospital is a few blocks from the scene of the shooting.  See id. at 42:2-6, 46:4-23.  ADA Ridges testified that Officer Padilla never informed him prior to his presentation to the Grand Jury that he saw Celestin in the emergency room before to the photo array identification.  See id. at 46:14-20.  Det. Robinson, however, testified that he had informed ADA Ridges of this.  See Def. 56.1 Statement ¶¶ 138-39; see Jacobi Decl., Ex. L at 75:7-22, 87:16-22.

On October 18, 2002, the Grand Jury indicted Celestin for, inter alia, attempted murder, robbery, and possession of a weapon.  Def. 56.1 Statement ¶ 177.  ADA Ridges has asserted that it was only after the indictment that he learned the contemporaneous description of the suspect did not fit with Celestin's age, weight, or clothing, and that no officer or detective had brought this to his attention.  See Allen Decl., Ex. 7 at 32:6-19.  ADA Ridges also later learned that a hospital entrance log listed Celestin as arriving at 12:20 a.m., although the accuracy of the entrance log was undetermined.  See id. at 77:9-11.  Knowledge of all this information, he stated, would not have changed his decision to pursue an indictment.  See id. at 97:5-21, 101:21-102:4.  Rather, it would only have affected the information he would have revealed to defense counsel in anticipation of a suppression hearing.  See id. at 97:5-21.  Nearly a year later, ADA Ridges dismissed the case against Celestin prior to trial because of the hospital admission record, only one eyewitness identification, and the DNA test results showing Celestin's DNA did not match evidence found at the scene.[2]  See Def. 56.1 Statement ¶¶ 157, 178.  See Jacobi Decl., Ex. Q at 82:20-25.

_____

[2]       ADA Ridges testified that he could not get Celestin's blood tested earlier because Celestin refused to give a blood sample.  A court order was needed to obtain the sample.  See Jacobi Decl., Ex. Q at 84:12-14; see Pl. 56.1 Statement ¶ 280.

## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when the record before the Court shows "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  The moving party has the burden to demonstrate that no genuine issue of material fact exists.  Id. at 586.  If the moving party carries its burden, the non-moving party must come forward with "specific facts showing there is a *genuine issue for trial*."  Id. (quoting Fed. R. Civ. P. 56(c)) (emphasis in the original). The non-moving party, however, "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).   A genuine issue exists if a reasonable jury could find in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court's role in a motion for summary judgment is one of "issue-finding," not "issue-resolution."  Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  Therefore, the Court's charge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  The Court must draw all reasonable inferences in favor of the non-moving party.  Matsushita, 475 U.S. at 586.  "Credibility assessments" and "choices between conflicting versions of events," when material to the inquiry, are determinations that the Court must leave for a jury.  See Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

## B.    Qualified Immunity

In a claim under § 1983, the plaintiff must show that "the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution." Palmieri v. Lynch, 392 F.3d 73, 78 (2d Cir. 2004).  The defendants contend that the officers and detectives are entitled to qualified immunity from such a suit, a defense that "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Qualified immunity protects an official from liability where:  "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir. 2001) (internal citations omitted).  It is not a mere defense from liability but an immunity from suit that is lost if the Court wrongly permits the case to reach trial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quotation omitted).  Thus, the Court must address this issue first.  See id. (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)).

### i.    Personal Involvement of Boyle, Padilla, and Allee[3]

A prerequisite for any award damage under 42 U.S.C. § 1983 for an alleged constitutional violation is the personal involvement of the defendant.  Warheit v. City of New York, 271 F. App'x 123, 126 (2d Cir. 2008) (citation omitted).  "Although a lack of

---

[3]    The defendants contended that Det. Boyle and Chief Allee were not personally involved in The plaintiff's arrest and prosecution but made no argument that Officer Padilla was not personally involved in the arrest.  See Memorandum of Law in Support of Defendants Motion for Summary Judgment, dated June 30, 2006, at 16.

personal involvement may be grounds for dismissing a claim on the merits . . . such a lack is also relevant to a defense of qualified immunity because it goes to the question of whether a defendant's actions violated a clearly established right." Iqbal v. Hasty, 490 F.3d 143, 153 (2d Cir. 2007) cert. granted on other grounds, 128 S. Ct. 2931 (U.S. June 16, 2008) (No. 07-1015) (citing McCullough v. Wyandanch Union Free School Dist., 187 F.3d 272, 280 (2d Cir. 1999)).  The Court must determine whether any genuine issues of fact exist as to the defendants' personal involvement.  Iqbal, 490 F.3d at 153 (quoting Johnson v. Newburgh Enlarged School Dist., 239 F.3d 246, 255 (2d Cir. 2001)).

Personal involvement may be established by a showing of direct participation, meaning "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation "such as ordering or helping others to do the unlawful acts."  Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).  For a supervisory official, the Court employs a more elaborate test to determine personal involvement in an alleged constitutional violation:

> The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

Iqbal, 490 F.3d at 152-53.  The plaintiff's allegations that Officer Padilla, Det. Boyle, and Chief Allee were personally involved in his arrest are without merit, belied by the record and by the plaintiff's own words.

Celestin himself testified before the Grand Jury that he asked Det. Boyle at Caledonia Hospital whether he was under arrest, and Det. Boyle told him that he was

not. Celestin was neither handcuffed at Caledonia Hospital nor during his transfer to Brooklyn Hospital later in the morning. The only reasonable conclusion from these facts is that Celestin was arrested at Brooklyn Hospital where neither Officer Padilla nor Det. Boyle were present. The Court can similarly find no evidence to support the allegation of Chief Allee's direct participation, gross negligence, deliberate indifference, or other theory of personal involvement in Celestin's arrest.

Similarly, the Court finds no evidence of Det. Boyle's or Chief Allee's personal involvement with Celestin's prosecution. Det. Boyle merely interviewed Celestin and other witnesses, collected evidence, and passed the information he learned on to the other officers participating in the investigation. Chief Allee had no connection with the police investigation or Celestin's prosecution except for his presence at Caledonia Hospital and his heated conversation with Celestin. The plaintiff's claims against these defendants cannot withstand summary judgment.

The defendants' motion for summary judgment is granted on the § 1983 claims of false arrest and malicious prosecution as to Chief Allee and Det. Boyle based on their qualified immunity for lack of personal involvement, and for the same reasons, summary judgment is similarly granted on the § 1983 claim of false arrest as to Officer Padilla.

## ii.    Qualified immunity of Det. Robinson for false arrest[4]

As the arresting officer, Det. Robinson violated Celestin's established Fourth
Amendment right against unreasonable searches and seizures if Celestin's warrantless
arrest was without probable cause.  See Marshall v. Sullivan, 105 F.3d 47, 53-54 (2d Cir.
1996).  Qualified immunity from this claim turns on whether it was objectively
reasonable for Det. Robinson to believe that probable cause for arrest existed.  See
Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007).[5]

Probable cause exists when an arresting officer has knowledge or reasonably
trustworthy information of facts and circumstances that are sufficient to warrant a
person of reasonable caution in the belief that the person to be arrested has committed
or is committing a crime.  Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  Probable
cause to arrest depends on the "totality of the circumstances," Illinois v. Gates, 462 U.S.
213, 233 (1983), and is an objective rather than subjective inquiry as to "the reasonable
conclusion to be drawn from the facts known to the arresting officer at the time of
arrest."  Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004).  Under the collective
knowledge doctrine, "where law enforcement authorities are cooperating in an
investigation . . . the knowledge of one is presumed shared by all."  Peterson v. Saraceni,

---

[4]    A § 1983 claim for false arrest grounded in the Fourth Amendment right to be free from
unreasonable seizures is "substantially the same as a claim for false arrest under New York law."  Weyant
v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  A plaintiff must show:  "(1) the defendant intended to confine
the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the
confinement, and (4) the confinement was not otherwise privileged."  Bernard v. United States, 25 F.3d
98, 102 (2d Cir. 1994).  An arrest is privileged if it was supported by probable cause.  Bail v. Ramirez, No.
04 Civ. 5084(WHP), 2007 WL 959045, at *6 (S.D.N.Y. Mar. 29, 2007).

[5]    Defendant need not show subjective good faith to be entitled to qualified immunity, for
such an inquiry would always present issues of fact and thereby undermine the purpose of qualified
immunity which is the dismissal of insubstantial claims.  Jenkins, 478 F.3d at 87 n. 9.

No. 95 Civ. 2624(AHN), 1997 WL 409527, at *4 (D.Conn. July 16, 1997) (quoting <u>Illinois v. Andreas</u>, 463 U.S. 765, 771 n. 5 (1983)).[6]

In the qualified immunity context, belief that probable cause existed need only be "arguable," meaning that competent officers could look at the same set of objective facts and come to conflicting yet equally reasonable conclusions as to whether probable cause for the arrest existed.   See <u>Lennon v. Miller</u>, 66 F.3d 416, 423-24 (2d Cir. 1995).  "It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases, those officials – like other officials who act in ways they reasonably believe to be lawful– should not be held personally liable." <u>Id.</u> at 423 (quoting <u>Anderson v. Creighton</u>, 483 U.S. at 635, 641 (1987)).

Probable cause may be determined as a matter of law where there "is no real dispute as to the facts or the proper inferences to be drawn from such facts . . . ." <u>Rounseville v. Zahl</u>, 13 F.3d 625, 630 (2d Cir. 1994).  Here, no genuine dispute exists as to the facts known to Det. Robinson that provided the basis of Celestin's arrest:  (1) Officer Padilla identified Celestin out of a photo array as the shooter, (2) Celestin was at 505 Ocean Avenue, the scene of the shooting, at approximately the time the shooting took place, and (3) Celestin had suffered a gunshot wound that was consistent with Officer Padilla's account of shooting the suspect.  See Def. 56.1 Statement ¶ 140.[7]  The

---

[6]     The collective knowledge doctrine also requires that the officers were in communication with each other.  <u>Pichardo v. N.Y.P.D.</u>, No. 98 Civ. 429(DLC), 1998 WL 812049, at *6 (S.D.N.Y. Nov. 18, 1998).  The record shows that Det. Robinson was informed by others participating in the investigation of evidence pertinent to the probable cause determination.

[7]     The plaintiff argues that the true basis for Det. Robinson's arrest was "pressure that he was under to close the case." <u>See</u> Pl. 56.1 Statement ¶ 140.  <u>See</u> Allen Decl.– Ex. 10 at 196:14-24.  This assertion, even if true, is plainly irrelevant.  Even if the arrest was effectuated solely to satisfy Det.

plaintiff suggests that there are questions of fact as to whether the identification procedure was so flawed as to make it objectively unreasonable to rely on the identification.  His suggestion is without merit.

A positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest.  See Bail v. Ramirez, No. 04 Civ. 5084(WHP), 2007 WL 959045, at *8 (S.D.N.Y. Mar. 29, 2007).  See also Miloslavsky v. AES Engineering Soc., Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992), aff'd, 993 F.2d 1534 (2d Cir. 1993) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth").  The plaintiff argues, however, that two photo arrays *may* have been shown to Officer Padilla, and if so, Officer Padilla probably saw Celestin in the first array, failed to make an identification, but identified him after seeing him again in the second array.  See Pl. 56.1 Statement ¶ 271.

It is not *per se* unduly suggestive to include a suspect's picture in a second array after including it in a preceding array that failed to elicit an identification.  U.S. v. Concepcion, 983 F.2d 369, 379 (2d Cir. 1992) (considering the substantial likelihood of misidentification due to certain photo array practices and the subsequent effects on in-court identifications) (citing United States v. Maguire, 918 F.2d 254, 263 (1st Cir. 1990) and United States v. DiPalermo, 606 F.2d 17, 21 (2d Cir. 1979) (per curiam) (criticizing multiple showings of defendant's photograph but concluding that procedure did not create a substantial likelihood of misidentification)).

---

Robinson's bosses, his actions were not improper if supported by objective evidence that created probable cause.  Devenpeck, 543 U.S. at 152-53.

Yattoni v. Overbrook Terrace, 801 F. Supp. 140, 147 (N.D.Ill. 1992), aff'd, 14 F.3d 605 (7th Cir. 1993) considered whether the identification of a suspect in the second of two photo arrays both including the suspect's picture established probable cause.  The court there held that there was probable cause if the "totality of the circumstances" of the photo array did not create an undue risk of misidentification.  Id.  Such a procedure may be too unreliable to establish probable cause when, for example, the second group of photos bears no resemblance to the suspect; the suspect's image leaps out at the witness due to its prominence, size, or clarity; or the witness is somehow encouraged to select the suspect.  Id.  Presenting a witness with a second photo array, while not encouraged, is not in itself a suspect practice, and absent a showing that the photo array procedure was unduly suggestive given the "totality of the circumstances," it is reasonable to rely on the identification.  See id. at 147-48.  Even assuming without deciding that Officer Padilla was shown both photo array "63289" and "63290," they both contained photos of individuals who generally resembled Celestin; Celestin's photo was not remarkably different from the other photos in terms of size, color, or prominence; and the record contains no evidence that Officer Padilla was guided to choose Celestin's photo.  Given these circumstances, such a procedure would not be unduly suggestive.

The reasonableness of Det. Robinson's reliance on the identification in arresting Celestin was not dissipated by subsequently learning that Officer Padilla had seen Celestin at Caledonia Hospital earlier that morning.  It is an unfair burden to require collateral investigations into a complainant's credibility after the arresting officer possesses facts sufficient to establish probable cause.  McDermott v. City of New York,

18

No. 94 Civ. 2145, 1995 WL 347041, at *4 (E.D.N.Y. May 30, 1995) (Glasser, J.). Celestin's shoulder wound and presence at the scene of the shooting corroborated Officer Padilla's identification, and no additional evidence suggested that Officer Padilla's identification was mistaken or fabricated. Officer Padilla's observation of Celestin prior to the photo array would have been relevant to his credibility at his identification but does not detract from the objective fact of his identification as a legitimate factor in the determination of probable cause.

There is also no issue as to whether exculpatory evidence negated probable cause. The police must not ignore exculpatory evidence that would void probable cause if taken into account. Richards v. City of New York, No. 97 Civ. 7990(MBM), 2003 WL 21036365, at *16 (S.D.N.Y. May 7, 2003) (citation omitted). However, once the evidence establishes probable cause, an officer is not required to continue investigating, sifting and weighing information, nor is an officer obligated to investigate the suspect's plausible claims of innocence. See Panetta v. Crowley, 460 F.3d 388, 396-98 (2d Cir. 2006). It is not the role of police officers "to sit as prosecutor, judge, or jury. Their function is to apprehend those suspected of wrongdoing . . . ." McDermott, 1995 WL 347041 at *4 (quoting Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989)).

Celestin's alibi, the differences in his physical description, his demeanor, and the extent of his injuries were all factors to be considered in the "totality of the circumstances," Gates, 462 U.S. at 233, but they were not enough to negate probable cause. Det. Robinson was not required to investigate Celestin's alibi or exhaustively search for other suspects before acting on the facts at hand.

Despite the most noble attempts to articulate its parameters with precision and

clarity, probable cause still remains "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Panetta, 460 F.3d at 395 (quoting Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002)).  Celestin was at the scene of the shooting at approximately the time it took place.  He was shot at the scene just as the suspect reportedly was.  He was identified by a police officer eyewitness as the shooter.  Notwithstanding the variegated discrepancies revealed by the memories of police officers testifying years after the event, there are no discrepancies in the facts upon which Det. Robinson relied in arresting the plaintiff, facts which objectively provided probable cause to do so.

Det. Robinson had probable cause for Celestin's arrest.  The purported motivations grounded in animus and a clear disregard of duty attributed to Det. Robinson constitute nothing more than unsubstantiated conjecture.  McDermott, 1995 WL 347041 at *5.  As a result, Det. Robinson did not violate Celestin's clearly established constitutional right against unreasonable seizures and is qualifiedly immune from a claim of false arrest.

### iii.     Qualified Immunity of Det. Robinson and Officer Padilla for malicious prosecution

"To sustain a § 1983 malicious prosecution claim,[8] there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interest under the Fourth Amendment."  Rolon v. Henneman, 517 F.3d 140,

---

[8]     To prove malicious prosecution, the plaintiff must show:  "(1) the defendant commenced or continued a criminal proceeding against plaintiff, (2) the proceeding terminated in plaintiff's favor, (3) there was no probable cause for the criminal proceeding, and (4) the defendant initiated the criminal proceeding out of malice."  Bernard, 25 F.3d at 104.

147 (2d Cir. 2008) (quoting Washington v. County of Rockland, 373 F.3d 310, 316 (2d Cir. 2004)).   The plaintiffs pursuing such a claim under § 1983 must show that the seizure resulted from "the initiation or pendency of judicial proceedings" such as an arraignment or the filing of an indictment, whereas an action for false arrest under § 1983 is predicated upon the deprivation of liberty that occurs upon a warrantless arrest without probable cause.   Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997); Singer v. Fulton County Sheriff, 63 F.3d 110, 117 (2d Cir. 1995).   Police officers that unreasonably procure a prosecution without probable cause deprive a defendant of his rights secured by the Constitution and forfeit their qualified immunity.   See Palmieri, 392 F.3d at 78.

Probable cause in the context of malicious prosecution is "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." Rounseville, 13 F.3d at 629 (citations omitted).   See also Mejia v. City of New York, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) (defining probable cause as a belief that "the criminal proceeding could succeed and, hence, should be commenced").   Under New York law, the return of a Grand Jury indictment creates a presumption that probable cause existed to prosecute that defendant.   This presumption may be rebutted by establishing that "the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith."   Green v. Montgomery, 219 F.3d 52, 60 (2d Cir. 2000) (citations omitted).

The prosecutor has a duty to present, and the police have the duty to supply, "exculpatory evidence to the Grand Jury where such evidence is substantial and where it might reasonably be expected to lead the jury not to indict."   United States v.

Casamento, 887 F.2d 1141, 1183 (2d Cir. 1989) (internal quotation marks omitted).

Whether the conduct complained of is serious enough to constitute fraud, perjury, suppression, or bad faith turns heavily on the factual context of the case. Providing the District Attorney with "false information or manufactured evidence" that influences the decision to prosecute generally constitutes bad faith sufficient to rebut the presumption. See Chimurenga v. City of New York, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) (citing Babi-Ali v. City of New York, 979 F. Supp. 268, 276 (S.D.N.Y. 1976). The court in Richards v. City of New York found the presumption rebutted when officers withheld from the District Attorney conflicting eyewitness statements identifying different persons as the murderer because the conflicting statements could have affected the Grand Jury's decision to indict. Richards, 2003 WL 21036365 at *17. In Williams v. City of New York, No. 02 Civ. 3693(CBM), 2003 WL 22434151, at *7 (S.D.N.Y. Oct. 23, 2003), aff'd, 120 F. App'x 388 (2d Cir. 2005), the court held that not presenting evidence to the Grand Jury that officers at the crime scene did not identify the suspect in a photo array fell short of the required showing of fraud, perjury, or bad faith. Similarly in Gisondi v. Town of Harrison, 72 N.Y.2d 280, 284-86 (N.Y. 1988), the New York Court of Appeals held that the police's failure to investigate the defendant's solid alibi or to disclose to the Grand Jury that he differed greatly from some aspects of the suspect's description also fell short of rebutting the presumption. Id.

None of the evidence allegedly withheld from ADA Ridges was substantial enough to rebut the presumption of probable cause. If the police did not inform ADA Ridges of the differences between Celestin's description and the suspect's description, Officer Padilla's observations of Celestin in the hospital, or the uncorroborated hospital

entrance log, the failure to do so would not warrant a finding of fraud, perjury, suppression, or bad faith. The plaintiff has not proffered evidence from which even an inference can be drawn that Officer Padilla fabricated his story and identified him fraudulently.

The presumption of probable cause raised by the return of the indictment by the Grand Jury in response to the evidence presented to it by ADA Ridges as known to him at the time was not rebutted by any evidence proffered by the plaintiff. Nor is there any evidence in the record from which even an inference can be drawn that the indictment of the plaintiff by ADA Ridges was procured or induced by Det. Robinson or Officer Padilla. The defendants' motion for summary judgment must therefore be granted to them as regards the claim for malicious prosecution.

### C. Conspiracy

An action for civil conspiracy under § 1983 requires a plaintiff to show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)).[9]

Summary judgment for the defendants is proper for a number of reasons. First, there is no evidence to suggest that an agreement existed among the officers to violate

---

[9] The defendants assumed that the civil conspiracy complaint was brought pursuant to 42 U.S.C. § 1985(3). The Complaint clearly states that all federal claims were brought pursuant to § 1983. See Jacobi Decl., Ex. A. Moreover, "it is now axiomatic that [a conspiracy brought pursuant to 42 U.S.C. § 1985(3)] 'must be motivated by racial or related class-based discriminatory animus.'" Malone v. City of New York, 01-CV-6128(SLT)(RML), 2005 WL 1892019, at *9 (E.D.N.Y. Aug. 9, 2005) (quoting Graham v. Henderson, 89 F.3d 75, 82 (2d Cir. 1996)). Because no discrimination has been alleged, the Court will review the plaintiff's claim as one brought pursuant to § 1983.

the plaintiff's constitutional rights.  Second, "where the individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand."  Burrell v. City University of New York, 995 F. Supp. 398, 414 (S.D.N.Y. 1998) (citation omitted).  The individual defendants named in this suit are all employees of the City of New York, a named defendant.  Third, "to succeed in a § 1983 conspiracy claim, a plaintiff must prove not only a conspiracy, but an *actual deprivation* of a constitutional right."  Martinez v. Golding, 499 F.Supp.2d 561, 570 (S.D.N.Y. 2007) (emphasis in the original).  In the Complaint, the plaintiff alleges his rights under the Fourth, Eighth, and Fourteenth Amendment were violated.  See Jacobi Decl., Ex. A ¶ 36.  Because there was probable cause to arrest and prosecute the plaintiff, there has been no deprivation of a constitutional right and no valid claim of conspiracy.

### D.      § 1983 Claim against the City of New York

A municipality may only be held liable under § 1983 if the municipality itself causes the constitutional violation of a plaintiff's rights.  See Monell v. Dep't of Social Servs. of the City of New York, 436 U.S. 658, 691 (1978).  A municipality may be liable under § 1983 when it deprives the plaintiff of a constitutional right through the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [municipality's] officers" or through practices that are so "permanent and well settled" as to constitute governmental "custom."  Id. at 690.

The failure to train or supervise city employees "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact."  Wray v. City of New York, 490 F.3d 189, 195 (2d Cir.

2007); see also City of Canton v. Harris, 489 U.S. 378, 388-89 (1989) ("The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact . . . [and only then] can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."). To prove deliberate indifference, a plaintiff must show: (1) "a policymaker knows to a moral certainty that her employees will confront a given situation;" (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Jenkins, 478 F.3d at 94 (internal citations omitted). On a motion for summary judgment, the plaintiff must also "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Id. (quotation omitted).

The plaintiff's rights were not violated because he was arrested and prosecuted with probable cause. Additionally, the plaintiff has not "identified a specific deficiency" in the NYPD training program. Jenkins, 478 F.3d at 95. "[I]t is impossible to prevail . . . without any evidence as to . . . how the training was conducted, how better or different training could have prevented the challenged conduct, or how a hypothetically well-trained officer would have acted under the circumstances." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 (2d Cir. 2004) (quotation omitted). The plaintiff's § 1983 claim against the City is dismissed.

### E.    State Law Claims

The plaintiff's federal claims are dismissed.  Accordingly, the Court declines to exercise supplemental jurisdiction over the plaintiff's pendent state law claims.  See 28 U.S.C. § 1367(c); Castellano v. Bd. of Trs., 937 F.2d 752, 758 (2d Cir. 1991) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (quotation omitted)). The pendent state law claims are dismissed without prejudice.

### CONCLUSION

The defendants have met their burden on this motion, and the plaintiff was not able to "do more than simply show that there is some metaphysical doubt as to the material facts" for a triable issue to remain.  Matsushita, 475 U.S. at 586.  For the foregoing reasons, the defendants' motion for summary judgment is GRANTED.


Dated:       Brooklyn, New York
             October 14, 2008


                                   _____/s/_____

                                   I. Leo Glasser
                                   United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

**<u>Counsel for the Plaintiff</u>**

Gerald Allen
Goldberg & Allen LLP
49 West 37th Street, 7th floor
New York, New York 10018

**<u>Counsel for the Defendants</u>**

Liora Jacobi
Corporation Counsel of the City of New York
100 Church Street, Room 3-220
New York, New York 10007